14-6063 Edward Monroe on behalf of themselves and all other similarly situated employees v. FTS USA LLC. Arguments not to exceed 15 minutes per side. Mr. Estrada for the appellants. Thank you Judge Boggs. May it please the Court, Miguel Estrada for the appellants. I would like to reserve 4 minutes for rebuttal. You may. This case should never have been tried as a collective action because the plaintiffs are not similarly situated. But even if they were similarly situated at some very high level of generality, it still remains the case that the judgment should be reversed because the plaintiffs never established that the witnesses at trial were actually representative and because the question of damages was never submitted to the jury, either as to the individuals or, most importantly, as to the opt-in members of the collective. Now, let me start with the 216 question of similarly situated. The plaintiffs begin by positing that there is a uniform corporate policy, the telltale sign of which is apparently that the company wishes to have its expenditures exceed its costs, which would make it fairly unusual in business practice. But generally, the policy as stated is a time-shaving policy that amounts to little more than a statement that the company has a plan to violate the overtime provisions of the FLSA. When you get into the specifics of the testimony of the technicians, the means by which the policy executed, you know, the company executed this policy vary quite widely. We're talking about technicians in 30 different offices with many different supervisors who, when were deposed and testified, testified to many different experiences. Some of them said that they completed their timesheets correctly, but that the timesheets were forged by the supervisors. Some of them claimed that they were told not to write down the time and didn't write lunch breaks or the like. Others, who were also purported to be equally representative of the absence, testified that they did take, you know, the lunch time. How should this have worked? I mean, I know it's, you know, let's say you're right and you get to do it the way you want, and, you know, I realize it's hard to, you don't want to be forced to concede anything, but it seems like the kind of case that one could bring as a collective action in some shape or form will put the damages issues to the side, how that would work. I mean, is this simply a matter of subclasses? Is that the way it worked? And if that's true, whose fault is it that we didn't have subclasses here? Well, let me start with your general question. Of course, we're not contending that there are not cases that are appropriate for FLSA treatment. You can have many of them. You see them in the caseload. The Dunning and Dauphin cases, for example, where the policy of the employer is you have to wear, you know, protective gear to slaughter the pigs or, you know, things of that nature, and that is compensable. But the policy is to, say, pay you only for five or six minutes, and the claim is that it takes 12 or 15. Now, you can see that there is a corporate policy that actually unifies everybody, and there may be other differences and other issues with the case. Here, you know, the problem is that the policy is stated at such a high level of generality that even with the additional subclasses, it would become fairly unmanageable. So your position is that each one of these people would have to have brought their own action? Well, absent proof of true representativeness, which is the second question. But you've stated it, I think, well in the sense of you call it too high a level of generality, but isn't the practical question here, in essence, an adequate level of generality in what is a regulatory enforcement? You can see that this is not the same as class action in the general civil context. We do, though I think... You didn't want to be pushed to saying that every one of them has to bring it differently, but where is the guidance on what's representative enough? I want to finish my answer to Judge Sutton... Integrate them. ...by pointing out that the allegations and, you know, the claims and the legal theories in this case are virtually identical to those in the Espensheet case in the Seventh Circuit, which concluded that this could not be tried as a collective action, which I must say is... But isn't your problem, Counselor, this is Judge Strange, but isn't your problem with the Seventh Circuit case that it specifically indicates that the Sixth Circuit disagrees with its standard, and doesn't the Sixth Circuit, in fact, disagree with the standard cited in the Seventh Circuit case? It does have a citation to the O'Brien case with a but-see, but I don't think for the proposition that was controlling in that case. I was actually going to point out that the issue on which this circuit and Judge Posner do agree is that the problem that he was identifying really sounds, if you were speaking in 23A terms, in commonality and typicality and not predominance. And while Judge Posner would impose a predominance requirement on 216 actions, that is the issue that is in the Supreme Court in the Tyson Foods case, you don't actually need to reach that. If you credit the dictum in O'Brien, which incidentally was not essential to the decision, but if you credit it as having been fairly stated, it's still the case that both circuits would require what amounts to commonality and typicality in order to conclude that the population is similarly situated. Let's not forget that in this case, like in all class actions, the caption of the case is plaintiff and others similarly situated, because they both share a common initial inquiry into the commonality and the typicality of the purported representatives. The point I was going to finish on the answer to Judge Sutton is that if you look at what Judge Crabb did in the Espanchit case in the district court, she did try to make it work with subclasses, and ultimately decertified the case when she concluded that the experiences were too varied and that she had not been given a good trial plan that would allow it to work. And so while I do not exclude the possibility that there may be cases, including cases similar to this, in which subclasses would be a management tool, I do think that the plaintiffs, as the proponents of a representational case, have the burden of identifying what those would be and how a trial plan could be executed that would really honor representational proof. You raised Tyson Foods, which is a question I'm going to have for both of you. I mean, I thought of Tyson Foods as mainly about damages, but I guess it really has a liability component to it as well. And I guess my question for both of you is do you have a preference as to whether we march ahead and decide the case as things that are or wait for Tyson Foods? I think it is conceivable that Tyson Foods has a bearing. As I said earlier, we think of this case as more of a commonality and typicality. And what Tyson Foods is arguing for is a predominance reading that is read into Section 216. I want to say that it should have no bearing under the basis of our argument here. I'm sorry, Your Honor. Go ahead. Because we do contend that there is insufficient commonality and typicality. But at the end of the day, and to go back to the point that I was making to Judge Boggs, the issue here is whether you can identify a practice that is stated at some meaningful level of specificity. And we do have published cases. You know, we have the Seto case in the Ninth Circle where the garment workers all uniformly testified. Counsel, I think Judge Stranch had a question. I have a question. The examples that you're giving, the Donning and Dolphin type cases, seem to me separate from the analysis that we find in Mount Clemens. Because Mount Clemens recognizes that there needs to be a similarity in the cases, but it recognizes that the burden is on the employer to have kept adequate time records. That is a type of case that's separate from the very simple Donning and Dolphin cases. And I would agree with you that those are a category that's clearly covered by the FLSA collective action. But it feels to me that your argument is there cannot be a category of cases in which there is a dispute on whether overtime was paid properly among a whole category of employees. Is your position that it has to be something such as Donning and Dolphin that we all are just fighting over how many minutes, as opposed to a plan which is alleged here to prevent or suppress the fair statement of overtime hours? No, I think, however, that if you're going to have a successful 216 action, I would not go as far as you say just Donning and Dolphin. I was going to give you other examples. But the key is that if you're going to rely on similarly situated and representational proof, you have to have some minimal level of confidence that the person who's testifying on behalf of the absent collective is typical. And the problem that Judge Crabb... My concern here is that you seem to have entered an agreement in how to proceed in this case, an agreement which the court memorialized by order, that you would jointly select the representative plaintiffs to have discovery on those and then would jointly select a category or a group of those to present representational testimony at trial. Why have you not already agreed to representational testimony in this case? Judge Strange, with all due respect, you are referring to a stipulation that was entered before the discovery and before we had reason to move for decertification and to preclude the use of representative testimony because we haven't had the discovery yet. I will point out that at all times where we had the question of certification, decertification, and the preclusion of representative testimony in front of Judge Donald, at no time did she rely on this stipulation or on a theory of waiver. And, in fact, when she ultimately so ordered the trial plan that was submitted by the plaintiffs in 2011, I believe it was in April 2011, her so-ordered trial plan expressly notes our objection. Were the plaintiffs' theory a correct one? May I go on? Go ahead. Were the plaintiffs' theory a correct theory, you would expect their remedy to have been in district court to ask her to enforce the stipulation if it meant what they now claim it meant. Thank you. Do either of my colleagues have additional questions? Let me ask one final question. I recognize, I think the point you just made resonates with me, that you're not bound to it, but in a practical sense, other than making the argument for complete decertification, did you make at trial or otherwise what you might say practical arguments about unrepresentativeness? For example, did you say, we chose ten technicians and none of them are anything like what you did, or that Judge Sutton asked about subclasses in the sense of what the district judge had before her. Did you make these kind of practical arguments as to why they would not, in fact, be representative based on facts? Yes, we did. Where would I look for that? We filed a motion to decertify the class and, in addition, a motion to preclude the use of the representative testimony. Okay. If that's what it's of, then I can find that. And finally, sort of trying to work with the confines that the trial court had given us, at the charging conference we proposed a jury verdict form that asked for express findings on the question of representativeness of the trial witnesses and for findings as to all the absent class members, with the jury being asked to identify which theory for which representative the absent class member actually matched. And that was denied. Okay, thank you. You'll have your time for rebuttal. May it please the Court, Counsel, Adam Hanson on behalf of the appellees. The district court did not abuse its discretion in this case in certifying the case as a collective action under 216B, in managing the trial, or in awarding damages. And this is really an exceptional case in an outlier in three important ways that really drive the resolution of this appeal. The first is the volume of common evidence in this case that's frankly rare to see in Fair Labor Standards Act cases, showing that you have a unified de facto policy of shaving and under-reporting time by this company. You know, for what it's worth, I saw a unified motive. I did not see a unified implementation of that motive. I mean, it seemed to me, even at discovery, it was apparent that there were different ways. We'll accept the motive, but even in discovery it seemed there were different ways of implementing this so-called company-wide policy. There are certainly differences, and I do want to address those. There are differences in what I would call the manner of underpaying or perhaps the means of underpaying. But that's bound up in the motive, I think, Judge Sutton. But isn't that – I just thought that was the key issue. I mean, another way of putting this is who's representing whom. I mean, there's a lot of question-begging going on. I don't know why after representative discovery, given your theory of representativeness, FTS could not file for summary judgment not to decertify but to say we win as a matter of law. We're going to put forward Mr. Smith, who was told to report every hour, and he was told to over-report. He's the representative. We win as a matter of law. I'm pretty sure I know your answer to that would have been he doesn't represent everybody else, right? I think the answer to that would have been Mr. Smith doesn't exist because – There was no one that was told to report every hour? Not in this record. I mean, FTS was given an opportunity to present a defense at trial. They called four executives. What they didn't call is a single employee who said, I was paid for all my time. But I asked a question about after discovery. Was there not one of the 50 that said I was told to report every hour? There's not one of the 50 that testified that he reported all of his hours. There was testimony among the 50 – No, not what they did, what they were told to do. That's what my question is, what they were told to do. There was conflicting testimony on that point, but there is a great deal of consistency across the board on – in the sense there were some plaintiffs that heard different messages from different supervisors. That's what you mean by conflicting. There's conflict as to the means, but that's really it. I mean, a supervisor can say – can state the policy in so many words. I mean, there's testimony, for example, that we cited where the supervisor said, either you subtract the time or I'll do it for you. I mean, the difference between a case where you've got a common plan to under-report time and one where you don't is because if you're talking about this really is a company that has a lawful policy and maybe there's an occasional deviation from that lawful policy, that wouldn't support a finding of similarly situated under 216B. But the motive does matter here because if a company says, look, you don't report your morning hours today, you don't report your evening hours today, those employees can participate in a single collective action together because all that matters is the under-reporting is occurring and the company is requiring it. You don't think the different means is exactly what you need for similarly situated. I would have thought the different means suggests they're not similarly situated. I respectfully disagree. I mean, the means can matter in the right case, but what's important in this case is looking at the total mix of proof. You've got the president of the company going around to different sites instructing technicians to under-report overtime. That's in the record. You've got the president and CEO of the company instructing managers to instruct the technicians to under-report overtime. You've got people complaining about this. The administrator who testified in plaintiff's case in chief for Unitech testified she got wage and hour complaints every day and nothing was ever done about it. So you've got this common means of under-reporting time. And it's not as if the policy is – Would you say the Seventh Circuit decision is distinguishable or wrong? I think both. Principally distinguishable, though, and there's several reasons why it's distinguishable. I mean, the first was already alluded to by Judge Stranch, which is that this circuit standard in O'Brien is different from the Seventh Circuit standard that was applied to Espensheet. There's also the abuse of discretion standard. I mean, the Seventh Circuit, after Espensheet, has gone on to affirm certification in cases that are quite similar to this one. You have to look at Espensheet as listing reasons in support of the district court's exercise in discretion to decertify. You're saying the Seventh Circuit's not even followed that case. Is that what you're saying? I'm saying the Seventh Circuit, under the abuse of discretion standard, recognizes that there is a pocket of discretion that the district court has. Or you might have cases where what looks like the same case, one district judge would certify, one would decertify, and they'd both be right. Sure, that's certainly reasonable, and especially given what happened in Espensheet, Judge Boggs, because you've got what appears to be a judge who's willing to certify the case at the district court level in Espensheet and says, okay, plaintiff's lawyers, give us subclasses, come back with a trial plan based around these parameters. And according to Judge Posner, the plaintiff's rather truculently refused, and the district court decertified. And, frankly, that's reasonable for a district court judge to do when dealing with truculent lawyers. It's really against this backdrop of the common evidence that you have to evaluate the differences in this case. It's not as if you've got a company that says, we don't want people to take lunch. They just want people to perform their work on time within the time frames that the cable companies set forth. So where you've got this common policy of just saying, look, get the work done, don't report all the hours, that's where the means of underreporting really is, you know, it's insufficient to defeat the similarly situated standard. I asked your friend on the other side about Tyson's food. What's your preference? Is your preference we decide today or wait for the court's decision in that case? I think the same answer is plow ahead. You know, there's always the possibility that Tyson could have some bearing on this case, but there's a standing issue that's not raised here, and I think there's just enough procedural and factual dissimilarities that it makes sense to proceed, and we'll see what the Supreme Court does. I want to move on to discuss the trial plan in this case. The trial plan that was employed in this case was not a novel invention. This is the same trial plan that the district court used in the Mount Clemens decision, and it was the same trial plan that the Supreme Court ultimately blessed in the Mount Clemens decision. So Mount Clemens, though, that's about estimates with respect to a plaintiff, right? No. Mount Clemens has 300 plaintiffs, and I wanted to get to that in a moment. Okay. Go ahead. The key to understanding Mount Clemens is to understand both what the trial court did and then, of course, how the Supreme Court allocated the burdens in that case. So Mount Clemens had 300 plaintiffs, very similar to this case. Eight of those plaintiffs testified, and what the district court did in Mount Clemens should look very familiar based on the record in this case. The district court took the testimony of those eight plaintiffs, which ranged from 30 seconds of walking time to eight minutes of walking time. Okay, that's a variance of 1,600 percent, and the district court said, I'm going to apply the average of that amount to each of the 300 employees' time records and award damages in that way. So that's essentially the same damages methodology that was used in this case. Mount Clemens was actually a Sixth Circuit case, so it came up here in 1945, and this court said, No, we're not going to accept that. That's too speculative. And then the Supreme Court, of course, with that trial plan in mind, said, That's not fair. The employer has the obligation to maintain records, and when the employer fails in that obligation, the employees, and the Supreme Court used the singular because that was more common back then, but an employee or the employees are allowed to prove the amount and extent of the unpaid time by just and reasonable inference. And then only then, when the burden then shifts back to the defendant, the defendant can then come in with now having the burden of production and disprove the reasonableness of that interpretation or offer specific evidence that employee A, John Smith, or employee B, John Doe, in fact, didn't work the amount of unpaid time. Absent that, the Supreme Court said the district court should make an approximation of damages, and that's exactly what the district court did in that case with 300 people. This is the area which it seems like the certification of damages issues overlap a little bit because you have a common motive in that case and common means. I mean, isn't it fair to say Mount Clemens? I mean, you've acknowledged in this case there weren't common means, there was a common motive, but wouldn't you say in Mount Clemens you had a common motive and a common means of implementing that motive? I think that's right, but I don't think the distinction matters. And, you know, with respect to this means question, I think another place to look is I think if I'm right that it's a problem, it's a problem for certification and damages. I don't think it's a problem for certification and damages. I mean, you could make a distinction. Well, no, I'm making the point if it's a problem for one, it's a problem for both. That's all I'm saying. I think they are interrelated. I would agree to that point. I would also look at, you know, the seminal case for certification is this Court's decision in O'Brien. I mean, what's a decertification case? This Court in O'Brien specifically held, went out of its way to disapprove of what the district court did and say this decertification order was wrong. Now, O'Brien had some other holdings about Rule 68, and as a result of those holdings, there was no reason, there were really no plaintiffs left as a result of those alternate holdings. But, you know, as to that common means question, this is what I want to get at, Judge Sutton, is in O'Brien, I think it's fair to say that the Court described two common means. The Court described off-the-clock work, and then the Court described the editing of time punches. So in that case, I mean, you could make an analogy to this case. You've got this off-the-clock work, and that's the way that O'Brien described it. And the O'Brien Court went out of its way to say this should have been certified, that the similarly situated standard is lower than Rule 20 joinder, that it's lower than the predominant standard under Rule 23, and this should have been certified. So I think that answers the question about means. It certainly can't be that you've really got 100 different policies, but if you're looking at one policy, some variation in the manner in which that implemented, simply because the company wanted to save money, that gets you there. That gets you there. I also want to address the point of this agreement. We were speaking about Mount Clemens, the trial plan that the Mount Clemens Court employed, and the burden-shifting framework, which is the same trial plan that the Court adopted here. But there's an additional reason to affirm the trial plan that the Court had here, and that's the parties very early in this litigation struck what I would call a grand bargain with respect to the course of this litigation. We were at the very end of discovery. The defendant hadn't taken very much discovery. They wanted discovery on these 300 opt-ins, and the plaintiff subjected to that. And we were able to resolve that discovery dispute without court intervention. But the deal that was struck was you will get discovery, wide-open discovery, on these 50 people where we choose 40 and you choose 10, but we will go to the district court and propose a plan for representative proof based on these 50. Yeah, but I mean, maybe you're not listening to them, but the response to that is you can't know until after discovery whether people are similarly situated or whether this works as a representative. I mean, I just have no idea what you mean by this. That's why the agreement doesn't preclude their motion for decertification. The agreement merely says, look, we'll do discovery on these 50. You bring your motion for decertification. If the plaintiffs prevail on that motion for decertification, this is the trial plan. We're going forward with these 50. So it doesn't preclude them from bringing that motion for decertification, but what it does preclude is a complaint about the structure of this trial based on the agreement. If we focus, though, then on the motion for decertification, which you're saying that's where they should have fought it, what's your view of what the discovery showed? That is, is it simply the same thing we've talked about that they say, well, sometimes they said do it this way, sometimes they said do it that way, or did they discover some of the people that didn't have any problem at all? That is, if I were on their side, I would pick the 10 people that you think were the most honest at their time and then harp on them. What, in fact, happened in your view? What discovery showed is a tremendous pattern of underpaying over time, and defense was able through the cross-examination to show, I think, that plaintiffs were similarly situated, although not identically situated. You could certainly find somebody and say, on November 4, 2009, you took a lunch, didn't you? Yes. I said, I rarely took a lunch, but on that day I did. On this day, you were sick, you came in late, so you clocked in at the right time. Yes, I did. That happens once in a while, but the great bulk of the evidence, the great mass of the evidence, the pattern from which one would deviate was this unlawful policy. This goes really to the last point about what makes this case unique, is that under the Supreme Court's Ortiz v. Jordan, once we have a trial, the trial record supplants the summary judgment record. FTS was free and did bring a motion to decertify after trial based on that best evidence under the federal rules of evidence. Under Mount Clemens, FTS had all the opportunity in the world to call technicians. Let's start with that group of 50. If there was anybody in that group of 50 who didn't work any overtime or could take the stand and say, I was told to report all my hours and that's what I did, they could have presented that. They didn't. That's because that person doesn't exist. There was nothing in the district court's orders that precluded them from calling non-plaintiffs, so simply a regular employee of the company to say, I was paid for all my hours. To make sure I'm following you, are you saying in thinking about decertification here, are you making the point we can only consider the evidence at trial as opposed to the 50 depositions? I think you can consider both. What's the point you're making? I'm missing the point you're making. The point I'm making is that the trial provides a mechanism. May I continue to answer the question? I thought that your answer was that you can consider both. That's right. You don't just go back and retry the SJ motion. The point of the trial is it provides a mechanism, of course, based on the discovery that it was had. Yes, the trial evidence can supplement the discovery evidence. That's the point you're making. The point I'm making is to the extent there was anyone that could have been presented at trial to substantiate that point that I was paid for all my hours, there's no unlawful cause. That's the thing I'm struggling with. If they already had deposition testimony that makes those points, as it seems to me they did, it makes no difference that they didn't put that person on at trial when it comes to decertification. That's the point I'm making, and I just want to make sure I'm not missing something. I think that's right, but there's still an obligation to mount a defense, and the last point I'll make is that the Supreme Court and this Court have said that the failure to put that in the record can be taken as affirmative evidence in the plaintiff's favor, and they had the opportunity to present that evidence. Thank you. Thank you. Mr. Strada, you have four minutes. I'm sorry, Judge Stranch has a question. Go ahead. I just had a question on the calculation of damages, the 1.5 multiplier versus the 0.5 multiplier. Can you briefly explain why there's not a problem with calculation since the method of calculation did not go back and recalculate the hourly rate based on the inclusion of the unrecorded overtime hours? Yes, so there's a legal issue here about whether the 1.5 or the 0.5 multiplier should apply. Judge Donald ruled it should be the 1.5. I think everyone agrees that when an employer is paying a piece rate worker on a prospective basis, that the governing regulations allow for the total pay to count as the 1 of the 1.5, whereby the 0.5 can be added. But it's our position that this regulation does not speak to the situation here where you have off-the-clock work. In that situation, the employee is essentially working for free, especially in light of the trial testimony in this case, which says that the amount of the straight time that was paid was only for recorded hours. In other words, you don't get the benefit of the 1 when the pay that was paid to the employees only accounts for the recorded hours and not the off-the-clock. Let me take you through that and see if our math is on the same page. As I understand it, if you pay piece work, and let's say they do enough pieces to get $500 for the week, if they actually worked 40 hours, you'd call it $12.50 an hour. If they actually worked 50 hours, that's still okay. You would just call it $10 an hour of straight time and so forth. We okay so far? Once you went to the trial and you got these averages as to how much unrecorded time they worked, why wouldn't you do it exactly that way? You would say, okay, you clocked 40 hours and you were cheated. It turns out you really worked 50, so we call it $10 an hour and we add half-time to that. And that was what I thought the court should have done here. Is there something wrong with my methodology? There is in the context of this case, which is, you know, I'll just try to reiterate the point I made to Judge Strange and hopefully make it a little clearer. But under the regulation, there is this presumption that if an employee is paid properly for all his time, that the straight time covers all the hours. But here, there was a witness for FTS that testified that this pay, this straight time pay, was strictly for the recorded hours. In other words, the off the clock work. Okay, but then your proof, and correct me here if I'm wrong, I thought your proof was, and that's what it was calculated on, on average these guys worked, you know, 10 hours or 7 hours or whatever the number is. So once you have that number, you should just add that to the, you would knock down the straight time proof. Same thing I just said, right? If you take exactly the case I gave you, $500 of piecework, they really worked 50 hours, so their straight time should be $10 an hour, and you give them half again for their $10 of extra time, overtime. I think we're in agreement that you can do that on a prospective basis, but once you cross the bridge and the employer issues the paycheck and says, here is your pay for these 30 recorded hours, or let's use a better example, 35 recorded hours, and there's no pay at that point for the 10 unrecorded hours. At that point, the employer- But on a piecework basis, they don't get any pay for, quote, the unrecorded hours. They'll get the same paycheck. It's just what's the right number to calculate the overtime on. That's right, up to 40. Up to 40. So, again, am I right that if this was a fight between working 30 and working 35, there'd be no damage? Okay. All right. I think we've got the theory. Okay. Mr. Estrada, you have four minutes for rebuttal. I'll try to move through them quickly. Mr. Hanson started by touting the volume of common evidence, but he did not really cite any other than a general plan to violate the law. I think it's useful to talk about some of the actual trial witnesses because they helped to drive the point home. We can start with Edward Monroe, who's at the top of the caption. He was in the Memphis office. He testified in his own representative capacity that as the suit was filed, time started getting paid. Other people who testified from that office testified to the contrary. Tellingly, in the course of his employment, Mr. Monroe became a supervisor and then the general manager of the Memphis office, which would make him the tool by which our alleged corporate policy was actually being executed. Now, how on earth can somebody like that be a representative of the people who claim to have suffered from this practice? And how is it that while he testified that he did everything right and that he enforced the overtime laws and that, therefore, this wouldn't happen on his watch, other people who purportedly to be equally representative as he testified to the opposite? You know, the point that Judge Sutton made during the earlier argument is the key question here. Who represents whom? As I started to say earlier, Judge Crabb made this very point in the course of decertifying the class and espionage sheet. You have people who testify to a common practice of doing a general level thing through very different and opposite means. It is logically impossible to extrapolate from these witnesses who they're representative of with respect to the absent collective class. Now, I will say that, you know, it doesn't, I think, matter to the resolution of this case. We do point out that a lot of what the O'Brien case said was dictum because there was no need for the court to engage in a disquisition on what similarly situated mean. But the one point that surely was not dictum was the one point where the court gave its reason for affirming, and it was that the theories of liability, which were two, were not shared by the absent members. And that's clearly true here. And if any are shared, we don't know which because there was a wide diversity in what the jury heard. I agree with Judge Boggs on the question of the point five, and I think his analysis basically sums up what our position is. I don't think that there is any basis in the regulations for this retrospective sort of distinction that counsel is making. I want to emphasize, however, that the case went to the jury on a question on which the plaintiffs bear the burden of proof without any evidence whatsoever of damages. We objected. The evidence was the testimony of the technicians as to what the average claimed hours were. Those go from eight hours to 24 hours. It is impossible to know which of them is typical of anybody else, and there is no support for the average of averages. But keep in mind that if all of that were right, you know, the jury heard literally no evidence on what the time worked was. And so in a piecework system, in order to compute damages, you would not have any damages, as Judge Boggs pointed out, until you hit 40 hours. And therefore, if the jury was never asked to find out what the actual time worked was on weeks, you would not be able to calculate what the rate that applied to the damages is. So you're saying the eight to 24 was the testimony as to the amount of unrecorded time? I am looking at the jury verdict with Boggs, and there were specific findings as to the average that each of the named plaintiffs worked. And the lowest was Matthew Queen at eight hours. So this is from the verdict form? Yeah. So you're saying that maybe some of them worked less than 40 hours for some of this time. Was that argued to the jury? We tried to put the question of representativeness to the jury, and Judge Donald would not let us. Well, representativeness, but, for example, did you argue that if they say there were eight hours unrecorded, that doesn't matter if they were regularly working 30 hours, and here's some evidence that they were only working 30 hours. Well, I think that point was argued to the jury. The problem is that the jury was only asked to answer the question in gross whether the plaintiffs up or down worked overtime. And the point that I was making is that if you accept— Well, but when you say, and I won't hold you to the word if it wasn't intended, did they work overtime, that implies you started with 40 hours. No. So I think what they actually were asked to say, and this is question three in the verdict form, and I'm grateful for the correction, is how many unrecorded hours. Unrecorded hours, okay. Right. And so I think that that's quite important because a technician who would have worked 30 hours or 32 hours would have no claim for overtime. But in any event— Did you propose that in a verdict form? We proposed a very detailed jury instruction, I mean jury verdict form that actually broke down, you know, the theories as to who claimed the lunch thing, who claimed the commuting thing, which— Did it have this over or under 40 hours in it? I don't recall. I don't believe so, but I don't have it in front of me. All right. We can look at it. Go ahead. The point is, just my final point is, damages are an element of the plaintiff's claim. If there is zero evidence before the jury and the calculation of damages was performed afterwards, even if everything else I said today was wrong, that would still require overturning this judgment. Thank you, Your Honor. Anything else, judges? Judge Stranch? Judge Hutton? Thank you. The case will be submitted, and the clerk may adjourn court. This honorable court is now adjourned. Judge Stranch, I'm going to disconnect from the courtroom, and I will dial up in the roving room. It will take just a few minutes. Thank you. Thank you. Thank you.  Thank you. Thank you.  Congratulations. Thank you. Congratulations. Congratulations. Congratulations. Congratulations. Congratulations. You guys did well. I know! They were on. Did he text you? He did. I didn't know you said turn it off. I tried to turn it back on. Yeah. Oh, I'm so sorry. No, it was, um, one of those things where, so, where, which monitor is it on your, it's just that you're confused. Um, I did, let's see, um, he told me let's left counsel. I thought it was the, I thought it was the right judge monitor. I might be wrong. Oh, okay. And it has to be, and it has to be left counsel, doesn't it, then? That's right. It is left counsel. Because it's, as you're facing them from the bench. It didn't do it, though. Man, he must have turned it off. Well. Upstairs. Oh, I didn't realize that, no. I mean, it shouldn't, this shouldn't have anything to do with it. I mean, it should, you know, we had it like this, and, oh, well, we're disconnected, that's why. Okay. So, yeah, we had it on judge cam. Wow. So, everything was on the judge cam. Uh-huh. And then, yeah, it just messed up. Anyway, we can deal with it later. You can, like, you go ahead and shut this one off. Okay. I'm going to, I'm going to go up there and talk to them. When's our next, um . . . Four o'clock.  Yeah. I'm sorry. But, yeah, we do have a four o'clock. Okay. What are you talking about? You're talking about today? Yes. Oh, gosh. Okay. Um, but, we're not going to use the, we're not going to use the video system. Correct. Okay. Okay, good. Okay, good.